EXHIBIT I

Preliminary Opinions of Darrell L. Ross, Ph.D.
Hartger v. Kent County, et al., No. 1:18-cv-1221-RJJ-RSK

October 29, 2019

I, Darrell L. Ross, Ph.D., declare that if called upon as a witness, I would competently testify to the facts
set forth herein. I declare the following:

1.      That I received my Ph.D. in 1992 from Michigan State University. Since August 2010, I have
been employed as a Professor, the Department Head of Sociology, Anthropology, and Criminal
Justice, and the Director of the Center of Applied Social Sciences at Valdosta State University,
Valdosta, GA. That from 2006 to 2010, I served as a Professor and the Director of The School of
Law Enforcement and Justice Administration at Western Illinois University, Macomb, IL. I was a
Professor and former Chair of the Department of Criminal Justice at East Carolina University,
Greenville, NC from 1992 to 2006. Attached hereto is a current copy of my CV, a list of cases in
which I have rendered an opinion within the last four years, and my fee schedule.

2.      From 1985 to 1992 I served as the Technical Assistance Coordinator for the Criminal Justice
Institute at Ferris State University, Big Rapids, MI. My duties included: research and training for
police, corrections, security, and military personnel, locally and nationally and I also instructed
academic courses. I was a certified instructor by the Michigan Commission on Law Enforcement
Standards (MCOLES) and instructed the state training curriculum in the police academy at Ferris,
including the mechanics of arrest, search, and subject control and restraint techniques, instructed
the subject control continuum, responding to persons in crisis and responding to persons with
mental disorders, physical fitness, and health and wellness.

3.      From 1973 to 1985 I worked for the Michigan Department of Corrections and I was the Unit
Manager/cell block manager of a psychiatric/protective custody cell block housing 500 mentally
ill prisoners at the State Prison of Southern Michigan, Jackson, MI. I was a correction officer and
a probation officer. Further, working for the training division as a certified instructor I provided
instruction at all levels of departmental positions and jail officers throughout the state, teaching a
variety of courses including, defensive tactics and subject control techniques, the use of restraints,
and crisis intervention, and policy and procedures

4.      I have published over 100 manuscripts, including articles, five books, and six book
chapters/monographs. I have authored and have made hundreds of national and international
conference and training presentations with a majority force related. I have developed and have
provided numerous line level and administrative training programs for police, correctional
officers, military, and security personnel throughout the United States and internationally. I have

1

been researching, publishing, speaking at numerous conferences and training seminars to police officers and administrators, instructors, death investigators, and attorneys on various issues of the use of force, officer involved shootings, human factors, developing policies and procedures on the use of force, use of force training issues, and developing use of force systems. I have analyzed thousands of published and unpublished Section 1983 United States Supreme Court and lower court decisions on the use of non-deadly and deadly force in law enforcement, published articles on the liability trends and implications of these decisions, and have routinely provide training to police officers and administrators on these decisions. I am a certified TASER instructor by Axon International (formerly TASER Intl.). I am also a certified law enforcement instructor by the GA POST. I am a member of seven professional associations.

5.    I have expertise from training, education, and experience, and possess specialized technical and scientific knowledge of: police use of force standards, policies, procedures, and practices, and responses to subject resistance, subject control techniques, use of force equipment and force options, and officer use of force training. Regularly I provide consulting services to police and correctional agencies to review and edit use of force policies and procedures. I am a board member of the Integrated Use of Force Options Training Organization (IL). Since 1987 I have served on the Pressure Point Control Tactics Management, Inc. Advisory Board (PPCT). As board member I have assisted in researching and developing the teaching curriculum and instructing these subject control and restraint techniques to thousands of police and correction officers, federal officers, private security personnel, all branches of the military, and instructors nationally and internationally.

6.    I have served as a consultant and or trainer for: National Institute of Justice, Michigan Commission on Law Enforcement Standards, GA Board of Regents University System of GA Campus Police, Topeka, KS PD, Battle Creek, MI PD, MI Sheriff's Association, Illinois Law Enforcement Training and Standards Board, IL State Police, North Carolina Justice Academy, Federal Law Enforcement Training Center, Integrated Force Options (IFO), Alaska Peace Officers Training Commission, Pennsylvania Law Enforcement Training and Education Commission, State of Florida Police Training Commission, Florida Department of Corrections, State of Wyoming Police Training Commission, American Corrections Association, National Institute of Corrections, Michigan Department of Corrections, Michigan Department of Corrections Jail Division, North Carolina Department of Corrections, Corrections Corporation of America, States Attorney's General Office in 6 states, U.S. Attorney's General Office in Florida, Federal Bureau of Prisons, Australia Government, Hong Kong Correctional Services, other

2

Preliminary Opinions of Darrell L. Ross, Ph.D.
Hartger v. Kent County, et al., No. 1:18-cv-1221-RJJ-RSK

agencies across the United States, and all branches of the military to mention a few (see CV for further reference).

7.    My preliminary opinions are based on my knowledge, research, training, and experience of these practices, training various criminal justice, military, and private security personnel, and from reviewing the following case documents:

> Plaintiff's Complaint and Jury Demand;
> Plaintiff's Initial Disclosures;
> Plaintiff's Amended Initial Disclosures;
> Plaintiff Johnathan Hartger's Answers and Responses to Defendant's Brandon Marz and Kent County's First Set of Interrogatories, Request for Production of Documents and Request for Admissions to Plaintiff Interrogatories,
> Defendant's Response to Plaintiff's Request for Production of Documents;
> Deposition of Johnathan Hartger;
> Training records of Deputy Brandon Marz;
> Kent County Sheriff's Office Use of Force Policy and Procedure, Chapter 5;
> Kent County Sheriff's Office Booking Records of Johnathan Hartger, 12/10/17;
> Kent County Sheriff's Office Internal Affairs Investigation Report by Lt. Russ Larson; and
> CD Recording of a Phone Call Between Mr. Hartger and Lt. Russ Larson

8.    I understand that Mr. Hartger has filed a civil action alleging that deputy Marz falsely arrested him on December 10, 2017, used excessive force during the arrest and performed an illegal search, and as a result he sustained injuries during the arrest. I have been requested to provide an opinion regarding the use of force policy of Kent County Sheriff's Office, the training provided to deputy Marz, and the force applied by deputy Marz during the arrest of Mr. Hartger.

My opinions described herein are preliminary and are not necessarily final in nature as I understand that additional discovery documents may be forthcoming. My opinions are preliminary and I reserve the privilege to amend and/or supplement them should additional discovery documents become available. Each opinion may be further developed through research, investigation, during deposition, and/or at trial. All of the preliminary opinions expressed in this report are in direct regard to the case and the underlying incident and are expressed to a reasonable degree of professional certainty and/or probability.

Preliminary Opinions of Darrell L. Ross, Ph.D.
Hartger v. Kent County, et al., No. 1:18-cv-1221-RJJ-RSK

9.      Further, my opinions are not intended to intrude upon the Court's realm but they are solely to provide background and explanation as to how law enforcement officers are trained, instructed, guided, and held accountable in their use of force in performance of their duties and I how I have instructed thousands of officers. The use of force standards, information, and guidance are used by law enforcement agencies, policy makers, and governmental officials to gauge the appropriateness of an officer's use of force. I understand that a dispute exists about the facts of the incident. In this regard my opinions expressed in this report are focused on whether a reasonable, trained, and experienced law enforcement officer, such as deputy Marz, use of force was appropriate given the totality of the circumstances that he encountered.

10.     ***Opinion #1    Kent County Sheriff's Office (KCSO) administrators developed and implemented an operational use of force policy prior to the incident***

An important function for law enforcement administrators is to provide their officers with relevant policies and procedures. Policies are a means by which an organization provides guidance and the basis for reasonable decision making for its employees. Policies cannot cover every conceivable situation that an employee will confront. They must allow for the totality of the circumstances, the use of discretion, and the on scene judgment by officers.

In my opinion, administrators of the KCSO have taken a proactive approach by establishing an operational policy which guide officers in their use of force options decision making. As it is related to this incident, I have reviewed the department's policy on *Use of Force*, Chapter 5. In my opinion, the policy appropriately guides department deputies in the use of reasonable force. The policy identifies that using force and what constitutes reasonable force is dependent on the facts in a particular case and that reasonableness of the force used will be judged in light of the circumstances as they appeared to the officer at the time the officer acted. The policy advises that an officer need not retreat or desist from efforts to make a lawful arrest or to restrain an inmate because of active, threatening, or passive resistance. The policy states that the officers shall only use the degree of force reasonably necessary to control the situation given the totality of circumstances and identifies a partial list of possible factors to consider within the totality of circumstances (see Section 1). Also, in Section 1, the policy directs an officer to immediately report to a supervisor the officer's use of force when Compliance Controls or above (see Force Continuum) are applied and the officer is directed to also submit an incident report (see also Section 8). The policy directs a supervisor to review the deputy's report and should a complaint of an injury be made a supervisor will review the incident.

4

Preliminary Opinions of Darrell L. Ross, Ph.D.
Hartger v. Kent County, et al., No. 1:18-cv-1221-RJJ-RSK

Further, the policy delineates between the use of deadly force (Sections 2-3) and non-lethal force and authorizes specialized equipment and tactics available to responding officers (sections 6-10). The policy authorizes officers to use force: in self-defense or defense of another person; to effect an arrest or persons physically or passively resisting; to prevent a person form injuring themselves; against persons creating a public disturbance in order to maintain public order; to control an arrested or incarcerated individual, who is either actively or passively refusing to comply with arrest, search, booking, or other necessary directives; against animals menacing or attacking a citizen or another officer (Section 6). The policy addresses the use of intermediate weapons including: Chemical Agents in Section 7; Impact Projectiles in Section 9; and Electronic Control Device (ECD) in Section 10. Section 6 establishes the treatment of injuries or complaints of an injury of an arrestee after the use of force.

The policy incorporates the Michigan Commission on Law Enforcement Standards (MCOLES) Subject Control Continuum which provides guidance to officers when deciding to use force and selecting a force response in response to a subject's resistance. The continuum describes various types of subject resistance and describes various types of force options available to the responding officer based on the totality of circumstances consistent with the objective reasonableness standard. I am familiar with various force continuums having instructed them in the police academy and during in-service training courses to officers, instructors, and administrators nationally and internationally. I am also knowledgeable of the MCOLES Subject Control Continuum having served as a consultant on its original design and development.

In my opinion KCSO administrators have taken proactive measures to provide their deputies with a written Use of Force Policy. KCSO administrators have fulfilled their managerial responsibility by developing and implementing the policy prior to the incident which properly guides deputies' performance in the field. In my opinion the KCSO policy comports with accepted contemporary law enforcement policies and practices. In my opinion the policy appropriately guided officer Marz in his response to Mr. Hartger's active resistance.

11.  ***Opinion #2***    ***Administrators of KCSO provided deputy Marz with appropriate training***

Consistent with the United States Supreme Court's decision in *City of Canton v. Harris*, 489 U.S. 378 (1989) KCSO administrators have provided deputy Marz with training commensurate with his law enforcement duties. Administrators of the department have made a conscious and proactive choice and as a matter of practice have ensured deputy Marz completed the academy

5

Preliminary Opinions of Darrell L. Ross, Ph.D.
Hartger v. Kent County, et al., No. 1:18-cv-1221-RJJ-RSK

training, and have provided him with regular in-service training in order for him to perform his assigned duties and the training is documented.

A review of deputy Marz's training records reveals that he completed the required police academy and acquired his law enforcement license on February 2, 2015.  During the academy he completed about 594 hours of state mandated training including training on criminal procedure, subject control, application of subject control, police tactical techniques, and the mechanics of arrest and search, accounting for 110 hours of the 594 hours (19%). After the academy, deputy Marz successfully completed the required KCSO's field training officer (FTO) program which provides supervision and guidance to a new deputy by a trained and veteran deputy over several months in order to assist the deputy in appropriate assimilation into the department.

By practice KCSO administrators also provide annual in-service training in order for deputies to keep abreast of their law enforcement duties. A review of Marz's training records reveals that he completed numerous ongoing training courses and numerous hours beyond the police academy. During 2016 and 2017, and prior to the date of the incident, deputy Marz completed about 59 hours of training on average. Relevant to this incident and since completion of the police academy, deputy Marz completed annual training on subject control tactics and CPR and First Aid, among other topics.

The combination of the training documents reviewed on the subject, with the foundational relevant policy identified, and the completed training provided adequately prepared deputy Marz to appropriately perform his duties. In my opinion deputy Marz followed the KCSO Use of Force policy and his training when he confronted Mr. Hartger, which is described in more detail in the following opinions. Overall, the policy reviewed and the training records assessed illustrate that KCSO's administrators have more than adequately prepared deputy Marz with operational policies and commensurate training in order for him to perform his sworn duties. These components manifestly show that that there is no evidence of a training or policy deficiency at the KCSO and they comply with accepted law enforcement practices. In my opinion deputy Marz was provided with relevant and current training commensurate with his job responsibilities.

12. **Opinion # 3**    *Deputy Marz responded appropriately to a dispatched suspicious call*

On December 10, 2017 at about 2:41 am deputies Marz, Holmes, and White responded to a dispatch regarding a suspicious call complaint at 7055 Brooklyn Ave. SE. Deputy Canda and sergeant DeGroot also responded to the residence later. The complainant indicated that a loud

6

Preliminary Opinions of Darrell L. Ross, Ph.D.
Hartger v. Kent County, et al., No. 1:18-cv-1221-RJJ-RSK

party was occurring at the residence and there were about 15 to 20 cars parked in the roadway. Deputy Marz was the first deputy to arrive at the residence and parked his marked patrol vehicle in the driveway of the residence. Deputy Marz observed numerous individuals walking in the roadway, observed numerous individuals standing on the residence porch, and he walked toward the house. Deputy Marz wore a KCSO brown uniform.

Several individuals entered the house and shut the door. Deputy Marz observed one individual later identified as Mr. Hartger on the porch, attempting to open the door but it was locked. As deputy Marz stepped onto the porch and came closer to Mr. Harger, he smelled the odor of marijuana emanating from him. As Mr. Hartger attempted to open the door Marz instructed him to stop. Mr. Hartger turned around, looked at him, pushed Marz's hand away, Marz instructed him to stop again, and attempted to grab Mr. Hartger. Mr. Hartger stated "don't fucking touch me" and fled from the porch into the side yard north of the residence.

During his deposition Mr. Hartger testified that: he rented the house for a night of private relaxation; was not sure how many people were there (maybe 15 to 20) and did not know the police had been called; there was no loud music playing; at the time he was outside by himself on the front porch; there were people at the door and the windows; the door was closed and no one was on the porch with him—not sure if anyone was on the porch at the time; he was outside for about 15 minutes to smoke a cigarette; he did not use marijuana and he did not drink that night; it was dark out and the officer approached him from behind and that the officer scared him; he did not see the police or see where he came from—heard a commotion behind him; heard the officer say "mother fucker" as he grabbed and slammed him; and he told the officer not to touch him and the officer became more aggressive—spun me around and pulled and slammed me quickly from behind (Dep. Pgs. 25, 28, 39-40; 43-44, 49-50, 52-54, 57-64,71).

Opinion

In my opinion deputy Marz was performing his legitimate and lawful duty and had authority to be at the residence. First, deputy Marz and accompanying deputies responded to a dispatched call to investigate a suspicious call complaint—a loud party. When the public request police assistance they expect that they will respond and investigate the complaint. Based on the nature of the call, several deputies were dispatched to the residence and began investigating the nature of the complaint. Deputy Marz and the accompanying deputies responded as I would expect.

Preliminary Opinions of Darrell L. Ross, Ph.D.
Hartger v. Kent County, et al., No. 1:18-cv-1221-RJJ-RSK

Second, on location deputy Marz assessed the situation and observed that numerous cars were parked in the roadway, observed several people in the roadway, observed that deputy Holmes and White were speaking with them, and he approached the residence to speak with those on the porch. The plan was to speak with the individuals, request that they move their vehicles, and to instruct them to stay inside and to be quiet.

Third, as Marz approached the porch he observed several people enter the house, shut the door, and it appeared that they were holding the door shut preventing Mr. Hartger from entering. Deputy Marz observed that the porch light was lite. Deputy Marz estimated that he observed about 15 to 20 cars parked along the roadway and about 50 to 75 people inside the residence. Fourth, on the porch, Marz observed Mr. Hartger attempting to open the door and instructed him to stop while holding his hand up. Fifth, deputy Marz reported that he smelled marijuana coming from Mr. Hartger and as Mr. Hartger looked at deputy Marz, Mr. Hartger pushed his arm away and Marz instructed him to stop again. Sixth, Mr. Hartger failed to comply and he fled from the porch into the residence yard (see Marz report and interview with Lt. Larson).

In reviewing this phase of the incident, information of what was known to deputy Marz at the time he was on the porch must be considered. In my opinion it would be appropriate for deputy Marz to form the impression that the complainant call matched his observations of numerous cars parked in the roadway, which caused a potential hazard for other vehicles to freely move in the roadway. There were numerous people in the roadway and on the porch, which added to the dynamics of the call. The mere number of individuals at the residence, in the roadway, and on the porch caused enough commotion for at least one person to call for police assistance. Deputy Holmes reported in his interview with lieutenant Larson that he saw cars parked everywhere and that people were everywhere (see Holmes interview). Deputy White reported in his interview with lieutenant Larson that he observed cars up and down the street and he and Holmes were checking the cars as Marz continued to the house (see White interview).

Seventh, deputy Marz formulated a plan to instruct the people move their vehicles and remain inside and to be quiet, which would be a reasonable and appropriate request at 2:40 am. Had deputy Marz been able to execute this plan, the deputies would have left without further incident. Compounding the call was the odor of marijuana. Deputy Marz reported that when he came close to Mr. Hartger, he smelled marijuana coming from him and deputy Holmes also detected the odor of marijuana emanating from the people that he was interviewing (see Marz report and Holmes interview).

8

Preliminary Opinions of Darrell L. Ross, Ph.D.
Hartger v. Kent County, et al., No. 1:18-cv-1221-RJJ-RSK

Deputy Marz's plan, however, was thwarted when Mr. Hartger assaulted him and fled from him. As Mr. Hartger attempted to enter the residence, deputy Marz instructed him to stop and reported that he did not touch Mr. Hartger. Mr. Hartger quickly turned toward deputy Marz, looked at Marz and pushed Marz's hand away, and stated "don't fucking touch me." Deputy Marz again told Mr. Hartger to stop and he attempted to grab Mr. Hartger.

In my opinion and within the totality of the circumstances which Marz quickly confronted, Marz would rightfully form the belief that Mr. Hartger assaulted him as he pushed Marz's hand away. Mr. Hartger, however, denied that he pushed Marz's hand away.

Deputy Marz followed appropriate police practices when he approached the porch. For officer safety reasons law enforcement officers are taught not to initially announce their presence to a large group or activate their flashlight until reasonably necessary as to prevent the risk of creating a threat focus on themselves. While it may be practical in some circumstance contacts to announce the presence of an officer, deputy Marz believed that responding in a fully marked KCSO deputy uniform would be obvious and he did not announce "Police Officer" on the porch. In my opinion, there is no evidence presented or testimony provided by Mr. Hartger that had deputy Marz simply announced his presence, the outcome would have been different. Deputy Marz provided Mr. Hartger with two opportunities to stop and he did not comply but rather decided to flee from Marz. Further, Mr. Hartger testified that he told deputy Marz "not to touch him" (Dep. Pgs. 58, 63, 66), indicating that he indeed was aware that deputy Marz was not only there but that a law enforcement officer was actually on location.

Mr. Hartger further claimed that he did not run from deputy Marz off of the porch but rather Marz threw him up against the door, that Marz drug him from the porch and around the yard, that the momentum of all of this ended in the yard, that Marz maneuvered him into the yard, and that he was beat and assaulted in the yard by Marz (Dep. Pgs. 67-69, 72, 76-79).

Mr. Hartger's testimony, however, is countered by deputies Marz, Holmes, and White. First, deputy Marz reported in his report and indicated during his interview with lieutenant Larson that Mr. Hartger pushed his hand away and ran from the porch. Second, Marz also reported that he followed him into the yard and tackled him about 15 feet from the porch in the yard. Third, during transport to the jail, deputy Marz reported in his report that Mr. Hartger admitted that he heard Marz tell him to stop, that he pushed Marz because he believed Marz was attempting to keep him from entering his house, and after pushing me, he stated that he was only trying to get around to the back side of the house when he began running through the yard, that he was scared

9

Preliminary Opinions of Darrell L. Ross, Ph.D.
Hartger v. Kent County, et al., No. 1:18-cv-1221-RJJ-RSK

due to his outstanding warrants, and admitted that he had recently been smoking marijuana and being high (see Marz report). Marz reported that after transporting Mr. Hartger to the jail his patrol vehicle smelled of marijuana (see Marz report).

Fourth, deputy Holmes reported that he responded to Marz's voice stating "over here," that he ran through the yards and found Marz at the right side of the house, about 40 feet to the right side of the porch, under the living room window, and Marz was on top of Mr. Hartger who was on the ground in the snow. Fifth, deputy White reported in his interview with lieutenant Larson that he heard Marz state over the radio that "he had one running" or "one on the ground," that after he parked his patrol vehicle he observed Holmes running, and followed him to about 30 to 40 feet northwest of the porch (right side of house) and observed Marz kneeling on top of Hartger (see interviews with Lt. Larson).

In my opinion, Mr. Hartger's description of deputy Marz slamming him into the front door of the residence, and the maneuvering and the momentum of Marz slamming and dragging his body off of the porch resulting in him ending up in the yard, some 30 to 40 feet away is incredulous. The goal of controlling a resisting person is to capture, control, and restrain them quickly. I do not know of any subject control technique or training that would guide a law enforcement officer to purposely prolong the control and restraint process by dragging the person off of a porch and then dragging the person around the yard for 30 to 40 feet in the snow. If deputy Marz was actually desirous of engaging in dragging Mr. Hartger, he could have "dragged him to the patrol vehicle" for a more expeditious and efficient method of control rather than slamming and dragging him throughout the yard, as his vehicle was parked in the residence driveway, and it was much closer to the front porch than where he ended up. Equally, deputy White heard Marz state over the radio that "he had one running and or one was on the ground."

In my opinion, it is more likely that Mr. Hartger indeed ran from Marz off of the porch as he stated during his transport to the jail and ran out of fear that the outstanding warrants would be discovered. It is well known in law enforcement and it is highly common for an individual with outstanding warrants to actively evade and flee from the officer during a contact, regardless of the circumstance. Marz followed-up on the statement made by Mr. Hartger regarding the outstanding warrants and discovered one issued from the 61st District Court for failing to appear ($200 cash/surety) and a second warrant issued out of the 63rd District Court for failure to appear ($1,150 cash).

Preliminary Opinions of Darrell L. Ross, Ph.D.
Hartger v. Kent County, et al., No. 1:18-cv-1221-RJJ-RSK

In my opinion, deputy Marz would rightfully form the impression that Mr. pushed him, supporting the elements of assaulting an officer. Combined with Mr. Hartger's statement that he ran from Marz and informed Marz that he heard him state stop, that he did push him and ran into the yard to get to the back of the house, due to the outstanding warrants, supported the arrest of Mr. Hartger. The physical actions of Mr. Hartger pushing Marz combined with his fear of the outstanding warrants being discovered, motivated his decision to flee which are certainly suggestive of criminal actions and wrong doing. Deputy Marz would appropriately form the belief that Mr. Hartger required to be taken into custody and this belief was also supported by the Kent County Assistant Prosecuting Attorney and the Magistrate of the 63rd District Court. Indeed, after the incident, deputy Marz presented three charges against Mr. Hartger, including Assaulting a Police Officer, Resisting, and Obstructing which were authorized by APA Dan Helmer and further authorized by Magistrate Mike Milroy of the 63rd District Court. Later at the jail bond was set at $1,000. During this stage of the incident deputy Marz responded appropriately in response to Mr. Hartger's physical actions which supported the arrest of Mr. Hartger and he followed accepted and legitimate law enforcement practices.

13.    ***Opinion #3       Deputy Marz used appropriate force in response to Mr. Hartger's assault and active resistance***

When examining an allegation of excessive force, the totality of circumstances of the situation must be examined within the framework of four general incident components including: (1) nature of the call/incident circumstances; (2) the circumstance environment; (3) the actions or inactions, including threats posed by the suspect; and (4) the response of the involved officer. In the training that I provide to police officers, administrators and police instructors, I emphasize that the review of the incident and an officer's response must be performed in accordance with the objective reasonableness standard and criteria outlined in the United States Supreme Court's decision in *Graham v. Connor*, 490 U.S. 396 (1989) including: the crime at issue, whether the suspect posed and immediate threat to the safety of the officer (s) or others, whether the suspect was actively resisting arrest or attempting to evade arrest by flight. Such an assessment recognizes that officers must frequently make a decision to use a level of force under tense, uncertain, and rapidly evolving circumstances confronting the officer (s). In accordance with these factors, whether the suspect posed an immediate threat to the officer's safety is the most critical. The use of force assessment must also include all of the facts and circumstances of each case on its merits, based upon the perception of the officer (s) at the moment force was required.

11

Preliminary Opinions of Darrell L. Ross, Ph.D.
Hartger v. Kent County, et al., No. 1:18-cv-1221-RJJ-RSK

Law enforcement officers do not have the luxury of scripting their response to the dynamics of a fluid situation. Police officers are taught and, in my training that I provide officers, I emphasize that their decision to respond with any level of force must be predicated on the resistive behaviors, and actions/inactions, demonstrated by a particular person.  Police officers may use force in self-defense, defense of another, to prevent a crime, to effect an arrest, to maintain control, and to prevent a person from harming himself. Frequently making a decision about using a degree of force must be made in a split second and there is no luxury of time for the officer to "wait and see" what a resisting person "may or may not do."

In the training that I provide to officers when making an arrest and using force measures, I emphasize officer safety, as well as suspect and general public safety. The use of force training focuses on reasonable necessity in light of the facts and circumstances as reasonably perceived by the officer (s) at the moment it is required. The actions and behaviors manifested by the individual guide the officer in deciding what level of force to use in a given circumstance. Based on my research on subject resistance during police arrests and research on human factors impacting field response to a force situation, I teach officers to cue into behaviors, body dynamics and statements or no statements made by the suspect, to cue into assault and threat cues, to cue into behaviors and quick movements of a suspect, to cue into a suspect's non-compliance to officer commands, to be aware of the presence, access, and use of weapons, to be mindful of the reactionary gap, their reaction time, and to be aware of the confrontational environment in which the officer is operating.

In Mr. Hartger's claims that deputy Marz used excessive force during the arrest he testified in his deposition that: he was grabbed by Marz from behind on the porch; he yanked me; told him not to touch me; picked me up and slammed me; threw me around—made it look like I was fighting him; drug me around the yard and was assaulted in the yard; I did not run and I said I am not resisting; he was lifted-up and pile-drived to the ground head first; he struck me several times; started striking me on the ground; on the ground pressure was placed on his back—was on top of me; it lasted a couple of minutes and that he couldn't breathe and screamed for help; other officers arrived and he was handcuffed and they were all laughing; his wrists were wrenched by the handcuffs; he was pulled up, told to shut up and told I smelled of marijuana; he was walked on his own power to the car and I did not fight them; and I was not disruptive (Dep. Pgs. 63, 65-72, 74-79, 81-83, 92-96).

Preliminary Opinions of Darrell L. Ross, Ph.D.
Hartger v. Kent County, et al., No. 1:18-cv-1221-RJJ-RSK

I reviewed three affidavits of alleged witnesses who claim they attended the party and witnessed the arrest of Mr. Hartger from the residence (McCay or McCoy; Lauren Christensen; and Aron Thomas). In my opinion, the affidavits were prepared by another person and all of them contained the same language describing the incident with no variation of what each specific individual actually witnessed. It appeared that each affidavit was signed by the person.

Deputy Marz reported in his report and during his interview with lieutenant Larson that as Mr. Hartger reached for the door, he instructed him stop, that Mr. Hartger turned, looked at him and pushed his arm away, instructed him to stop again, that Mr. Hartger stated "don't fucking touch me," ran off of the porch and ran north to the side yard. Deputy Marz also reported that he followed Mr. Hartger, tackled him, that on the ground Mr. Hartger stiffened his arms and would not place them behind his back, that he used wrist control and secured Mr. Hartger's right hand in handcuffs, that Mr. Hartger's left arm was under his body and tense, and that he grabbed it and placed it in the second handcuff. Deputy Marz reported that he assisted Mr. Hartger to his feet and searched him prior to placing him in his patrol vehicle.

Deputy Holmes stated in his interview with lieutenant Larson that he responded to deputy Marz calling out "over here;" ran to Marz's location; observed Marz on top of a guy on the right side of the home in the snow; and held Mr. Hartger's arm while Marz handcuffed him. Deputy White reported to lieutenant Larson that he heard Marz over the radio state that "he had one running" or one on the ground;" that he observed Holmes running in the yard, followed him to the right side of the house about 30 to 40 feet northwest of the porch; that he observed Marz kneeling on top of Mr. Hartger; that Mr. Hartger was handcuffed, the snow was brushed off of him, and that Mr. Hartger walked back to a cruiser (see White interview).

Opinion

In my opinion Mr. Hartger created the need to be secured and controlled when he assaulted deputy Marz, when he refused to comply and stop when Marz instructed him twice, and when he actively fled from the porch and ran on the northside of the residence with the intent of evading arrest and gaining access to the back of the house. Mr. Hartger actions escalated the situation when deputy Marz (and other deputies) was attempting to investigate a complaint of a suspicious call and a loud party and he impeded the investigation. Within the totality of circumstances of the incident deputy Marz responded appropriately when he used physical empty-hand control techniques to first ground Mr. Hartger when he actively fled the porch after assaulting him and secondly when he used wrist control in order to control and restrain him in handcuffs.

Preliminary Opinions of Darrell L. Ross, Ph.D.
Hartger v. Kent County, et al., No. 1:18-cv-1221-RJJ-RSK

I have studied and published on the nature of civilian or detainee resistance and I have trained thousands of officers on subject resistance for over 35 years. I have provided instruction to law enforcement officers on the use of physical control techniques to be applied on various types of subject resistance during a variety of subject and law enforcement officer contacts. Law enforcement officers are taught to gauge their degree of force based on numerous factors including but not limited to the nature of the circumstances, the type of crime committed, the actions and resistance of the person, in self-defense, and to control an arrested or incarcerated individual, who is either actively or passively refusing to comply with arrest, search, booking, or other necessary directives among others. The KCSO *Use of Force Policy* outlines these and additional factors for consideration (see Sections 1 and 6). Mr. Hartger's physical actions of pushing deputy Marz's hand away and fleeing from the porch and running away can be classified as active resistance and active aggression. Active resistance can include any actions by a subject (i.e., pulling/pushing away, blocking, etc.). Active aggressions can include physical actions of assault against a law enforcement officer (i.e., advancing, challenging, punching, kicking, grabbing, wrestling, etc.).

As I would expect, prior to the use of any force applied by deputy Marz he provided Mr. Hartger time to comply and on two occasions instructed Mr. Hartger to stop which would be appropriate and officers are trained to use verbal commands when feasibly possible. Rather than comply, Mr. Hartger pushed deputy Marz's hand away and fled. Additionally, an officer does not get to select the location, environment, or surface in which a force technique may be applied on a resisting subject.

1.      Takedown Technique

Based on the assault it was prudent and appropriate for Marz to follow after Mr. Hartger as he fled around the northside of the house. The goal of any decision to apply a degree of force is to capture, control, and restrain the person quickly to shorten the confrontation time span. In this incident, deputy Marz followed this force principle when he grounded (tackled) Mr. Hartger at the side of the house. Given the nature of Mr. Hartger's sudden behaviors of fleeing from being arrested using the tackling maneuver would be appropriate as it would quickly stop Mr. Hartger from fleeing further, would immediately stop him from gaining access into the house (which he informed Marz that was his intent), would successfully facilitate placing him on the ground to stop his resistance, and would also place Mr. Hartger in a position on the ground so that Marz could safely control and restrain him handcuffs. Grounding Mr. Hartger aligns with empty-hand-

14

Preliminary Opinions of Darrell L. Ross, Ph.D.
Hartger v. Kent County, et al., No. 1:18-cv-1221-RJJ-RSK

physical control techniques and is considered an acceptable takedown technique. By their implication, empty-hand control techniques are used with only an officer's empty hand (s) and their application has a low propensity for a resultant subject injury.

Takedown techniques are used in response to a subject's active resistance or higher and aid an officer in quickly grounding an active resisting person for safe control and restraint. Like a majority of use of force circumstances, deputy Marz was behind the reactionary curve when Mr. Hartger pushed his arm away and actively fled from the porch. As Mr. Hartger fled, deputy Marz was several steps behind him. Using the tackling takedown technique as Marz caught up to Mr. Hartger from behind him would be safe for Marz and Mr. Hartger, and was the most appropriate and preferred subject control technique to apply. In my opinion, deputy Marz's decision to apply the empty-hand control technique of tackling and grounding Mr. Hartger was appropriate and followed accepted and legitimate law enforcement subject control practices. Such actions by Marz complied with his training, experience, and complied with KSCO's *Use of Force Policy*.

Moreover, once deputy Marz grounded Mr. Hartger, he quickly followed up to control and restrained him, which I would expect, and followed the force principles of capture, control, and restraint. In his deposition Mr. Hartger testified that Marz landed on top of him on the ground, placed his knee in his back, placed pressure on his back, pulled his arms back, placed handcuffs on his wrists, picked him up, and searched him (Dep. Pgs. 82-95).

Actually, Mr. Hartger described the control and restrain process correctly and in my opinion deputy Marz followed his training during the control and restraint process as I would expect. Officers are taught that the best position to establish control and restraint of a combative person is to ground the person (as previously described). The preferred, more secured, and safest position to accomplish control and restraint is in the prone position and officers are not taught to control and restrain a combative person in the supine position. The primary purpose of its use is to reduce the level of danger to the officers and the person in order to safely control, restrain, and apply the handcuffs. Placing one or two knees on the back of a combative detainee who is prone or controlling the shoulder of a prone combative person are components of the restraint system used to safely control the person who is actively resisting so that the hands/arms maybe controlled for handcuffing. Placing a knee on the back of the person also assists in maintaining the person prone and from curling up, rolling away, or from standing up during the restraint process.

15

Preliminary Opinions of Darrell L. Ross, Ph.D.
Hartger v. Kent County, et al., No. 1:18-cv-1221-RJJ-RSK

2.     Wrist Control

It is not uncommon for a resisting person to continue resisting after being placed on the ground and during the restraint process in an effort to prohibit the officer from securing him in handcuffs. To facilitate control of a person's wrist, officers are taught to use another empty-hand control technique known as wrist control or a wristlock (soft empty-hand control). Grasping the person's hand/wrist the officer will apply downward pressure and flex the wrist toward the person's forearm and it is used in conjunction with pain compliance. A wristlock is one of the oldest and most common forms of control techniques used by law enforcement officers. Maneuvering the person's wrist in this manner facilitates control for the application of handcuffs by the officer. It is used daily by numerous officers across the nation during the handcuff process whether the person is standing, kneeling, or placed in the prone position.

In my opinion, deputy Marz did not deviate from a recognized known control and restraint procedure nor did he deviate from his training. Deputy Marz momentarily placed his knee on the back of Mr. Hartger, which is consistent with the restraint procedure (see White's interview with Lt. Larson). Deputy Marz was able to quickly apply wrist control and secured Mr. Hartger's left wrist in the handcuff. However, Mr. Hartger stiffened his right arm under his stomach and tensed it, which is considered resistance. Marz was able to secure control of Mr. Hartger's right wrist and secured it in the second handcuff and was assisted by deputy Holmes (see Holmes interview with Lt. Larson). After Mr. Hartger was secured in handcuffs Marz stood up, lifted Mr. Hartger up, searched him, escorted and placed him the patrol car, as I would expect. Marz followed standard law enforcement procedure by ceasing to using force once Mr. Hargter was secured in handcuffs. Marz also followed standard procedure by conducting a patdown search of Mr. Hartger. A patdown search is standard procedure to ensure officer safety as well as subject safety performed prior to transporting the arrestee.

In my opinion deputy Marz responded appropriately, was properly prepared, and trained to respond to Mr. Hartger's active resistance. The quantum of force used by deputy Marz in response to the active resistance demonstrated by Mr. Hartger was appropriate. Deputy Marz used verbal instructions and empty-hand control techniques including a control wristlock and a takedown technique to facilitate control and restraint of Mr. Hartger. Neither deputy Marz or any other deputy struck, kicked, choked, or used a pressure point, nor used a TASER, nor used a projectile, nor used an aerosol during the control and restraint process of Mr. Hartger.

Preliminary Opinions of Darrell L. Ross, Ph.D.
Hartger v. Kent County, et al., No. 1:18-cv-1221-RJJ-RSK

As I would expect once Mr. Hartger was restrained Marz ceased using any force techniques. The deputies responded as I would expect by ensuring Mr. Hartger was restrained safely consistent with his active resistance. There was nothing alarming, excessive, or inapporpriate about the use of empty-hand control techniques used by Marz, the use of the prone position, and the application of the handcuffs by deputy Marz in controlling and restraining Mr. Hartger. In my opinion deputy Marz followed his training and followed KCSO's Use of Force policy during and after the incident.

3.      Investigation

It is common to perform an investigation of a citizen complaint regarding a claim of excessive force. Mr. Hartger made a complaint on February 14, 2018. As I would expect lieutenant Larson of Internal Affairs performed the investigation for KCSO and filed a report. He interviewed Mr. Hartger (2/16/18), deputy Marz, Holmes, and White. I have listened to the phone interview between lieutenant Larson and Mr. Hartger. Mr. Hartger promised to provide Larson with contact information regarding several witnesses but never provided lieutenant Larson with the contact information. Also, during the interview Mr. Hartger focused on the financial aspects associated with the criminal prosecution and his frustration with the criminal charges and never identified or discussed sustaining any physical injuries as a result of the arrest. Lieutenant Larson concluded that deputy Marz's use of force was lawful and reasonable, that no KCSO policies were violated, and issued an Exoneration on March 12, 2018. Lieutenant Larson did indicate that he coached deputy Marz on verbally identifying himself even if he is in uniform.

14.     ***Opinion #4       Mr. Hartger did not request medical assistance after the incident***

Mr. Hartger testified in his deposition that as a result of the force used by deputy Marz he sustained several injuries including: torn ligaments in his neck; strained rotator cuff in his shoulder; a concussion from being slammed to the ground and he was knocked out; sprained wrists from the handcuffs; injuries to his stomach; scraping and frostbite on the side of his head; a small cut behind his ear; soreness throughout his whole body for a week; and testified that he couldn't breathe but screamed for help (Dep. Pgs. 114-118). Further, Mr. Hartger testified that: he reported the injuries at the jail; told them he was in pain and was crying; either he didn't request medical attention and/or couldn't recall if he requested medical attention at the jail; and he was held in jail for two days and released (Dep. Pgs. 118-120). Mr. Hartger testified that: he did not see a doctor until June of 2018; was never hospitalized as a result of this incident; and that he

Preliminary Opinions of Darrell L. Ross, Ph.D.
Hartger v. Kent County, et al., No. 1:18-cv-1221-RJJ-RSK

needs psychological counseling but has never made an appointment with a psychologist (Dep. Pgs. 126-128, 141-142).

Opinion

In my opinion Mr. Hartger's claim of sustaining the injuries as described in his deposition are not supported by deputies Marz, Holmes, or White and are not supported by any of the booking documents completed at the Kent County Correctional Facility (KCCF) by the booking officer or any jail personnel. Given the nature of the alleged injuries sustained by Mr. Hartger I would have expected that Mr. Hartger request medical assistance on scene, during transport to the jail, and/or at the jail. I would have expected that deputies Marz, Holmes, and White and the admitting correctional deputies would observe: bleeding, cuts, contusions, cognitive and motor control problems from the alleged concussion, and bruising on the wrists from the handcuffs. There was no report of Mr. Hartger needing assistance to walk into the jail or required a wheel chair. Moreover, I would have also expected that upon release from the jail that Mr. Hartger would have immediately gone to the nearest emergency room to seek medical treatment but he testified he waited for two months before he sought medical treatment.

Mr. Hartger's claims about the degree and nature of his alleged physical injuries are unsupported by the case documents and this is observed on several levels. First, if Mr. Hartger had actually sustained all of the alleged injuries, he would have been denied admission into the KCCF and transported to the hospital, assessed by a physician, and only after the hospital physician medically cleared him would he be admitted into the jail.

Second, deputy Marz reported that he transported Mr. Hartger to the KCCF without incident although Mr. Hartger argued with Marz about the arrest (see Marz report). Deputy Marz further reported during his interview with lieutenant Larson that he used reasonable force and that Mr. Hartger did not have any injuries on him. Deputy Holmes reported to lieutenant Larson that he, Marz, and White walked Mr. Hartger to a cruiser after he was handcuffed. Deputy White reported to lieutenant Larson that after Mr. Hartger was handcuffed the snow was brushed off of him and he walked back to a cruiser. None of deputies reported: that Mr. Hartger sustained any injury; that he requested medical assistance from them; that he showed symptomologies of any injury; and that Marz reported the transport to the KCCF occurred without incident. Indeed, Mr. Hartger walked under his own power to deputy Marz's patrol vehicle after he was secured in handcuffs.

Preliminary Opinions of Darrell L. Ross, Ph.D.
Hartger v. Kent County, et al., No. 1:18-cv-1221-RJJ-RSK

Third, Mr. Hartger was accepted into custody at KCCF and booked at about 4:03 am on December 10, 2017. Prior to accepting custody of Mr. Hartger, the booking officer addressed 10 questions with deputy Marz regarding the arrest and transport of Mr. Hartger and there was noting noted that he required immediate medical care.

Fourth, during the booking process a series of over 85 questions were addressed with Mr. Hartger covering his medical health history, substance abuse history, mental health history, psycho/social history, and current mental status. A review of the completed booking forms did not reveal any complaints made by Mr. Hartger that he requested medical assistance or that he requested to see the jail nurse to immediately assess him in response to any physical injury or a medical condition.

Fifth, in conjunction with the questions addressed during the booking process the booking officer documented personal observations of the arrestee. The booking officer's observations did not reveal any medical injuries sustained by Mr. Hartger. The observations noted that Mr. Hartger had a normal gait, normal breathing, and a normal skin appearance. Sixth, the booking officer also took Mr. Hartger's vital signs and reported on the form that his temperature was 98 degrees, heart rate was 88, resting rate was 18, Blood Pressure was 122.76, and PO was 98%. Seventh, Mr. Hartger's personal property was inventoried during the booking process. Eighth, according to the KCCF Housing Reports Mr. Hartger was housed in three different cells prior to his release on December 11, 2017 at about 3:16 pm.

Ninth, deputy Patton noted that on December 10, 2017 at about 6:31 pm he interviewed Mr. Hartger regarding his mental health. Patton noted that he was alert, oriented, and cooperative during the interview. Patton also noted that Mr. Hartger could keep himself safe, requested to speak with someone from mental health, and Patton referred him to a mental health professional. There was nothing noted during the interview between Mr. Hartger and Patton that Mr. Hartger was in immediate need of medical attention or that Mr. Hartger requested medical assistance.

From my review of Mr. Hartger's interaction with deputy Marz, Holmes, and White on the arrest location and Marz indicating that the transport of Mr. Hartger to the KCCF occurred without incident I conclude that Mr. Hartger did not sustain any injury requiring immediate medical attention as he has testified in his deposition. Additionally, my conclusion is further supported by a review of the completed booking process, the forms completed documenting Mr. Hartger's admission, visual observations made of him during booking, including taking his vitals, taking his personal property, and the interview with deputy Patton. Given the interactions that Mr. Hartger would have had with various jail deputies and being moved to three different cells over two days,

19

Preliminary Opinions of Darrell L. Ross, Ph.D.
Hartger v. Kent County, et al., No. 1:18-cv-1221-RJJ-RSK

I would have expected to see documentation of Mr. Hartger's claims that he sustained major medical injuries during his arrest as he has claimed. However, there is nothing in Mr. Hartger's jail records documenting that he required immediate medical attention, or that he requested medical attention, or that correctional deputies requested immediate medical attention from the jail nurse based on their personal observations, or that they made a referral to the jail nurse on his behalf. In my opinion, none of these documented factors support Mr. Hargter's claims that deputy Marz's use of force resulted in numerous and significant injuries.

Respectfully submitted by,

Darrell L. Ross, Ph. D.        October 29, 2019